[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Nature of Proceedings
By petition filed June 20, 1991, the Department of Children and Youth Services (DCYS) seeks to terminate the parental rights, pursuant to 17a-112 or the Conn. Gen. Statutes (Rev. 1991), of Juliana (a.k.a Helen) F. and Nelson S., Sr. In their children Nelson S. Jr., born November 21, 1988, and Angelica S., born August 15, 1989, so that these children, after nineteen months in foster placement at the time of filing, could achieve the permanency of adoption.
In the initial hearing on July 16, 1991, service was confirmed on both parents who appeared with court-appointed counsel and entered pleas contesting the allegations. After two trial days, concluding August 28, 1991, all parties rested and were given the opportunity to file trial memoranda by September 6, 1991. The period of reserved decision thus commences on September 6, 1991.
Facts
Evidence offered at trial, interpreted in light of the prior court record concerning these children, of which judicial notice is taken, supports the finding of the following facts: CT Page 10441
The parents, both born in the Dominican Republic, met in Hartford in 1986. No referrals were received by DCYS regarding the care of their first child, Nelson, Jr., until after the premature birth of their second child, Angelica, less than nine months later. At the time of this birth, both mother and daughter tested positive for heroin and cocaine. Pheno-barbital was prescribed for Angelica's withdrawal, and a referral made to DCYS to ensure adequate care of this fragile infant by parents who were both known to be drug addicted. When Angelica was a month old, her parents signed a service agreement with DCYS in which they agreed to attend drug rehabilitation counseling, keep all medical appointments for the infant and provide her with all prescribed medications. By the time Angelica was three months old, DCYS had received numerous referrals from professionals mandated to report child abuse under 17a-101 (b).
On two occasions (9/23/89 and 11/23/89) both children had been left with casual caretakers for extended periods of time without the parents having made appropriate arrangements for their care or making their whereabouts known. After the first such episode, DCYS, having taken the children under the emergency provisions of 17a-101 (c), returned them to the parents after three days. After the second episode — when the children had gone unfed, and Angelica unmedicated, for over six hours while in the care of an 11-year old neighbor child — DCYS again took emergency custody and this time obtained an Order of Temporary Custody from this court, pursuant to46b-129 sub (b), on November 27, 1989. In the case of both children, petitions alleging neglect were accompanied, pursuant to subsection (e) of 17a-112, by petitions also seeking to terminate the rights of both parents on the ground that such neglect constituted a deprivation of care by acts of parental commission or commission sufficient to secure such relief under 17-a-112, subsection (b)(3).
On June 25, 1990, after two days of trial, Nelson, Jr. was found to have been neglected both because of having been denied proper care and attention and having lived under conditions injurious to his well-being within the definition of neglect found in 46b-120. The parents' motion to dismiss the termination petition regarding Nelson was granted, however, because the facts establishing neglect by a preponderance of evidence (P.B. 1043) did not, without more, provide the requisite clear and convincing proof of the only ground alleged for terminating his parents' rights. Nelson Jr. was therefore committed to DCYS on that date for an initial period of 18 months, pursuant to subsection (d) of46b-129, and expectations articulated by the court that were CT Page 10442 calculated to facilitate parental resumption of his custody. (Court's Exhibit #1). These included weekly visits for the mother, the father being incarcerated at the time; drug treatment; freedom from substance abuse and criminal court involvement; and the securing of adequate housing. The proceedings regarding Angelica were continued to August 13, 1990 when she too, was adjudicated to have been neglected, not only for the circumstances that led to the adjudication of neglect of her brother, but also because of physical abuse and neglect both before birth, resulting from her mother's drug abuse (See In Re Valerie D., 25 Conn. App. 586 (1991); motion to reargue denied November 6, 1991, 25 Conn. App. ___) and for the first three months of her life while in her parents' care. On September 24, 1990 the court further found that the facts establishing such neglect also constituted clear and convincing proof that the deprivation of care by acts of parental omission and commission were sufficient to terminate her parents' rights. Termination was denied, however, on the failure of the petitioner to provide equally clear and convincing proof that termination of her parents' rights at that time was in her best interest. The termination petition regarding Nelson Jr. having been dismissed, all parties agreed that the two siblings, born nine months apart and having then been in the same foster placement for 10 months, should not be separated. Once again the same expectations were spelled out for the parents as a guide to reunification with Angelica, as well as with their son.
A year after Nelson Jr., was committed, these petitions were filed. In that year, neither parent had begun to fulfill any one of the articulated expectations:
Visitation — (See State's Exhibit C, pp. 2-3). In only two months of the twelve (July and August 1990) did the parents make regular visitation. In the nine months preceding the filing of these petitions out of 35 scheduled visits, the parents kept only nine, with the father visiting alone on two other occasions when the mother was incarcerated. Of the 24 scheduled visits that did not take place, DCYS had cancelled twice and the parents called to reschedule three times — though they failed to appear for two of three rescheduled visits. Curiously, after the termination petition on Angelica was dismissed and the parents encouraged to work on reunification with her as well as with Nelson Jr. (Court's Exhibit B), their visits deceased. When they asked to have the site changed from the foster home to the DCYS office, their visits became even more infrequent and irregular. The mother's last visit before these petitions were filed was in March of 1991; the father visited last on May 20, 1991, two days after the mother's most recent incarceration and three days before the beginning of his CT Page 10443 own.
2. Drug Counselling — DCYS referred the parents to a program at the outset of Nelson's commitment, but they had appeared to be intoxicated to the Community Health Services counsellor on their initial visit. (Testimony of Hawkins, August 20, 1991.) Subsequent visits were scheduled for which they appeared either late or not at all without giving valid reasons for their non-participation. The counsellor had agreed to waive the $10.00 per visit fee, and although Nelson Sr. had then received a $1,500.00 bequest from his mother, they continued to suggest that they could not afford the sessions. In the opinion of the counsellor, both parents required intensive residential treatment to be followed by at least one year of post-institutional sobriety before any lasting rehabilitation could be predicted. Both parents entered a different detox program at the Hartford Dispensary in April of 1991. Nelson Sr. completed a two week program but failed to appear for subsequent urinalysis; Juliana failed to complete the initial phase of the program. Both later testified they had used drugs subsequent to April of 1991, and both were incarcerated for drug-related charges in May.
3. Housing — At no time since these children were initially placed in November of 1989 has either parent secured housing in their own name or names. Both have moved from place to place, either with relatives, friends or prison. At no time did they inform DCYS at the time of such moves. The DCYS social worker only learned of their current addresses when they kept their infrequent visits with the children in the DCYS office.
4. Criminal Activity — Both parents have been repeatedly arrested since Nelson Jr was committed. In January of 1991 both were arrested for possession of drug paraphenalia and heroin; in February both were arrested for fighting in a restaurant; a week later Juliana was arrested for prostitution; two months later she was again arrested for prostitution. In early May the father was arrested for obstructing traffic and later that month (May 23, 1991) was arrested and incarcerated for parole violations, five days after Juliana had been arrested and incarcerated for sale of narcotics. Both parents deny responsibility for any of these criminal charges except for the fight in the restaurant.
By the last trial date, Nelson Sr. was working toward supervised home release in the home of his own father. Asked why he had failed to follow through on drug treatment, he replied that he "didn't have the time" and had only gone earlier because the DCYS social worker had sent him. He admitted using drugs on May 19, 1991, the day before his CT Page 10444 last visit with the children and less than three weeks after completing the Hartford Dispensary program. He had no source of income other than help from his father at that time, and when asked how he was able to buy drugs, he replied, "I used to get them free." Nelson Sr. had spent most of the year preceding giving his testimony on August 28, 1991, in jail.
At this same hearing, Juliana denied responsibility for the drug and prostitution charges for which she had been Despite sitting through the trial with closed eyes, she denied any current drug problem while giving as her reason for failing to enter drug treatment during the preceding year the severity of her drug problem at that time. After several months of abstinence during incarceration, she claimed to be free of substance abuse and therefore in need of no drug program.
Adjudication — On Facts as of the Date of Filing these Petitions (June 20, 1991).
It is not necessary to consider waiving the 12-month period required for grounds to have existed before termination may be ordered. This period, required by the general preamble to the grounds set forth in 17a-112, subsection (b), is deemed to commence not from the date of commitment but from the date the statutory ground first began. (In Re Saba, P. 13 Conn. App. 605,1988). Because the ground of failure to rehabilitate appears only in 17a-112 applicable to children committed to DCYS it is arguable that for this ground, at least the 12 months must start with the date of commitment. If this is the correct interpretation, the fact that Angelica was committed three months after her brother only because the state's case for termination of her parents' rights was stronger is a fortuity; had the termination petition on Angelica been dismissed when Nelson's was, she, too, would have been committed to DCYS on June 25, 1990. On that date the court had enumerated the expectations for reunification with Nelson, and when Angelica was committed in September, the same expectations were reiterated. It was precisely because the children were so close in age, were placed together, and the parents seeking to be reunified with both that the termination petition on Angelica was dismissed. The period of rehabilitation for these parents must be deemed to have begun with the articulation of expectations for reunification with Nelson Jr. on June 25, 990 — one full year before these petitions were filed. (See In Re Saba P., supra,13 Conn. App. at 609). Any other interpretation would lead to an unreasonable or irrational result unintended by the legislature. Beloff v. Progressive Casualty Insurance Co.,203 Conn. 45, 58 (1987). CT Page 10445
The petitioner has established by clear and convincing proof all three grounds pleaded for terminating the parental right of both parents in both children:
Abandonment — Between the time Nelson, Jr. was committed to DCYS and the filing of these petitions, of 52 weekly visits scheduled, both parents visited as scheduled only 12 times, with Nelson, Sr. visiting twice alone. On six other visits the parents arrived approximately one-half hour late, and seven other visits were cancelled for circumstances over which they had no control. Fully half of the scheduled visits were missed without the parents offering any valid excuse, and in the month immediately preceding the filing of the petitions, no visits could be scheduled because both parents were incarcerated. While incarceration per se may not constitute abandonment within the meaning of 46b-120, a chronic pattern of behavior resulting in frequent periods of incarceration — during which prison visits are either not requested, are deemed detrimental to the welfare of very young children, or at best can be arranged once a month — constitutes clear and convincing evidence of a failure to demonstrate a reasonable degree of responsibility as to the welfare of the child. For the purpose of termination proceedings, abandonment must be judged from the perception of the child and not from the intent of the parents. While neither Nelson Sr. nor Juliana ever manifested a settled purpose to be permanently separated from these children to an extent that would constitute abandonment at common law, their failure to maintain contact with these children resulted from their untreated drug problems and frequent incarcerations which prevented them from discharging their parental obligations. The result, from the children's point of view, is clearly a failure to manifest any reasonable degree of interest, concern or responsibility as to their welfare, as defined by statute.
2. Failure to Rehabilitate — Failure of parents to adhere to court articulated expectations for reunification does not, se, establish proof of this statutory ground to terminate a parent's rights. Such expectations, set forth at the time of commitment, are like service agreements negotiated from time to time between parents and DCYS, intended to serve as a guide to the major tasks which parents of neglected children need to accomplish in order to be able to resume their care. The record in this case provides exhaustive proof that none of the expectations for either parent that had been agreed upon when Nelson Jr. was committed, and reiterated three months later at the time of Angelica's commitment, was fulfilled in whole or in part, except for self-reported period of sobriety while both parents were incarcerated after their most recent arrests. CT Page 10446 Juliana testified that she had been "clean and clear" in the three weeks since she had been discharged last from Niantic, but her conduct during the trial raised some question in the mind of the trier of fact as to the validity of this claim. Even if true, the only expert witness who testified on drug treatment (Hawkins) stated that three weeks sobriety following institutionalization does not constitute proof of rehabilitation. Seventeen months before the adjudicatory date in this case, in January of 1990, a bilingual clinical psychologist had recommended that neither child be returned to either parent until that parent had demonstrated both compliance and progress in drug treatment. (Report of Dr. Miguel Suarez, State Exhibit #1, neglect trial, March 19, 1990.) In the 17 ensuing months, neither parent complied with or demonstrated progress in drug treatment. In this same period neither parent has had housing of their own or any visible legal source of income. Both have been repeatedly arrested, the frequency accelerating in the three months immediately before these petitions were filed. The ultimate test of this ground is whether the parents, in the year or more following commitment (or placement) of their children, are any closer to being able to assume their care than they were at the time of commitment (or placement). These parents, on the adjudicatory date of June 20, 1991, were actually less able to care for these children than when they were placed in November of 1989 or committed in 1990 Nothing in this record reasonably encourages the belief that "within a reasonable time, considering the age and needs of the child[ren], they could assume a responsible position in the life of the child[ren]."
3. Absence of Parent-Child Relationship — Dr. Suarez, in his evaluation of January of 1990, had found a parent-child bond between Nelson Jr. and the parents with whom he had spent the first year of his then 14-month life, but none between the parents and their then five month old daughter who had been removed from their care at the age of three months. The sporadic pattern of visitation since her placement was clearly insufficient to establish a parent-child relationship with Angelica where none had previously existed.
It also proved insufficient to maintain the relationship that the older child had had with his parents. A month before the adjudicatory date, even Nelson Jr. appeared frightened and reluctant to be with the parent — his father — with whom he had earlier demonstrated a closer relationship than with his mother a year earlier. Given the parents' accelerating, rather than diminishing, pattern of drug use and incarcerations, their chronic homelessness and joblessness and their refusal to admit any defects of parenting CT Page 10447 in the past (testimony of Juliana, August 28, 1991) or any substance abuse problems in the present, it is equally clear and convincing that "to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child[ren]." At best Nelson Jr. might be presumed to recognize the faces of his parents as infrequent visitors, but such recognition, does not constitute feelings and emotional ties for his parents sufficient to defeat finding this third ground for terminating their parental rights.
4. Acts of Commission or Omission as to Angelica — Although the petitioner did not check this as a further ground for terminating the parents' rights in the younger child, the court takes judicial notice of its finding that this ground existed in August of 1990. This was based on clear and convincing evidence that the mother's ingestion of heroin and cocaine shortly before birth caused physical harm to the baby whose withdrawals sufferings for weeks necessitated the administration of medication and that Angelica had been denied proper physical care for the first three months of her life due to her parent's failure to secure and administer such medication as well as to the repeated episodes of leaving this fragile infant with inadequate caretakers. Termination was only denied without prejudice in August 1990 because of the lack of clear and convincing proof that terminating her parents' rights at that time, when they continued to retain parental rights in her brother, would be in her best interest. Disposition as of August 29, 1991, final day of trial.
In the two months between the adjudicatory and dispositional dates, little had changed for either of these parents. Juliana had again been released from prison in early August, and claimed to have remained "clean and clear" since then, although her affect during the trial created some question of this fact. She did not, however, admit to having any need for any substance abuse program, claiming that her habit, which had admittedly continued until shortly before her incarceration of May 18, 1991, was now ended. Nelson Sr. remained incarcerated, anticipating an early supervised release to the home of his own father. His only plan was to secure housing with the $1,500.00 legacy from his mother — which he acknowledged he had had for a year and a half — but no concrete plan was given for employment or counseling of any kind. Twenty-one months after these children were removed from their care and placed in a foster home, both parents expressed their desire for "one more chance" to show that they are capable of raising these children. In this same twenty-one months, these children have become closely bonded CT Page 10448 with and have thrived in the care of foster parents who are committed to raising them to maturity. Federal legislation envisages eighteen months as the period during which parents may work toward the return of children placed in foster care. P. 1. 96-272. The respondents in this case, after 21 months, having made no demonstrable improvement in their ability to take care of themselves or their children, are asking for yet "one more chance." It is clearly in the best interest of children now three and one-half and two, after 21 months in placement, to be freed for adoption by their long time foster parents and thus provided legal security to the de facto parent-child bond which has flourished in this period.
Before parental rights may be terminated, however, the court must consider the six factors set forth in subsection (d) of 17a-112:
(1) DCYS did everything reasonable to facilitate the reunion of the children with the parents. They facilitated regular visitation, and changed the site when requested by the parents. Referrals were made to substance abuse programs. Given the parents' frequent incarcerations/homelessness and failure to keep most of the scheduled visitations, no other services could have been offered.
(2) While the court issued no orders in this case, clear expectations were articulated on two occasions and agreed to by the parents. Neither parent has even begun to fulfill any one of these expectations, but for their self-reported freedom from substance abuse during their most recent incarcerations.
(3) Angelica demonstrates no feelings or emotional ties with her I parents, but a close bonding with her foster parents who have had her for the last 21 of her 24-months life. Nelson, Jr. who demonstrated a bond with his parents — especially his father — when placed in November of 1989 appears now to have no feelings for either parent, and indeed manifested signs of anxiety on his last contact with his father a month before these petitions were filed.
(4) The ages of these children cry out for them to be assured permanency of caretakers after spending most of their lives in foster care. Nelson, at three and one-half, needs such assurance before leaving the confines of home for the broader world of school. Angelica, at two, having known only neglect during her first three months with her parents, deserves such assurance now, rather than having to face the insecurity of foster care during her "terrible twos."
(5) Neither parent has made any definitive effort to adjust CT Page 10449 their circumstances, conduct or conditions to make it in the best interest of these children to return them to their home(if they were to have a home) in the foreseeable future. They have maintained inadequate contact with the children when out of prison, and have conducted their lives in such a way as to prevent effective visitation when incarcerated. Further, their failure to inform DCYS promptly after their many moves meant that in a medical emergency they could not have been informed of their children's condition since the agency was compelled to wait for them to exercise visitation in the DCYS office in order to learn where they were living at any particular time.
(6) Nothing prevented either parent from maintaining a meaningful relationship with these children except their own chaotic lifestyles. No restriction, reasonable or otherwise, was ever put upon visits with the children except a reasonable reluctance to require the children to make a visit to Niantic prison to see a mother who had not visited them for the preceding three months when the request to do so was received after this action was initiated.
Having considered the foregoing, it is found to be clearly and convincingly in the best interests of both children to stop waiting for parents who have not been there for them for nearly two years, and to be assured the legal certainty of remaining with the only adults whom they both regard as parents, the foster parents of the last 21 months.
Therefore, it is ORDERED that the parental rights of Nelson S. and Juliana, a.k.a. Helen F. in and to their children Nelson S. Jr. and Angelica S. be and hereby are terminated. And it is further ORDERED that the Commissioner of DCYS be appointed statutory parent for the purpose of placing the children forthwith in adoption. Such Commissioner is further ORDERED to submit a written report as to the progress toward such adoption no later than 90 days after the date of this judgment and if adoption is not then finalized, to submit a Motion to Review Plan for Terminated Child no later than — 15 months after the date of this judgement.
Appeal
The parents have 20 days from the date of this judgment in which to take an appeal. It they request an appeal and their trial counsel is willing to represent them, this court will appoint that attorney to act as appellate counsel at public expense until all appellate process is completed. Practice Book #4017. If however, in the exercise of professional judgment as an officer of the Superior Court, the attorney declines to perfect CT Page 10450 such appeal because, in the attorney's opinion, it lacks merit, he is not required to do so but may instead simultaneously file a timely motion to withdraw and another motion to extend the appellate period to the full maximum of 40 days as permitted by law. Practice Book 4040. Such motions, if unopposed, will be granted ex parte and a new attorney appointed to review this record and make an independent determination of the merits of such appeal. If the second attorney determines it lacks merit, the reason for this opinion shall be promptly submitted to the court in writing. The parties will then be informed by the court clerk that they have the balance of the 40 days in which to secure counsel for the purpose of taking such appeal, who may, if qualified, be appointed by the court to be compensated by the state. Douglas v. California, 372 U.S. 353 (1963); Fredericks v. Reincke, 152 Conn. 501 (1965).
If such procedure satisfies the sixth amendment right to counsel in a criminal proceeding, it is a fortiori appropriate where there are interests of a third party involved: those of the child whose interest in achieving permanent nurturing parents is entitled to at least as great a degree of consideration as those of the parent whose right to raise the child is at issue.
Even an unsuccessful appeal could delay permanent planning for years since no child may be adopted until the appellate process, which could take years, is exhausted.
Entered at Hartford this 4th day of December 1991.
FREDERICA S. BRENNEMAN, JUDGE